IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

CORYN C. FRITZLER,

        Plaintiff,

v.                                       Case No. 6:15-cv-01193-JTM

ROYAL CARIBBEAN CRUISES, LTD,

        Defendant.

**MEMORANDUM AND ORDER**

Plaintiff Coryn Fritzler was an employee of defendant Royal Caribbean Cruises from 1997 until she was fired in August, 2014. Plaintiff claims that defendant's termination of her employment violated her rights under the Family Medical Leave Act (FMLA) and the Americans with Disabilities Act (ADA).[1] The matter is now before the court on defendant's motion for summary judgment. For the reasons discussed herein, the court finds that the motion should be denied.

**I. Uncontroverted Facts.**

The court finds the following facts to be uncontroverted for purposes of summary judgment. In keeping with the rules governing summary judgment, the court draws all reasonable inferences in the evidence in plaintiff's favor and views the record in the light most favorable to plaintiff.

---

[1] Substantial changes were made to the original ADA by the ADA Amendments Act of 2008, and the act is sometimes now referred to as the "ADAAA" to emphasize the point.

Plaintiff was hired by defendant as a cruise representative in 1997. In 2007, she was promoted to the non-exempt position of Senior Administrative Assistant. She initially assisted Mike Semler, who at the time was Director of the Wichita Call Center. After Semler passed away in 2012, plaintiff became Senior Administrative Assistant to Vince Alesia, who succeeded Semler as Director of the call center.

As a Senior Administrative Assistant, plaintiff was responsible for managing expense reports, travel, calendars, and meetings for Assistant Vice Presidents, Directors, and Managers. She had access to a budget in excess of $10 million, a Dillons credit account, a corporate credit card, and her supervisor's credit card. Plaintiff also provided administrative assistance to other company directors in other locations across the country.

Plaintiff's time records show she did not clock out for lunch from October 31, 2011, until August 20, 2014. Plaintiff testified that she stopped clocking out for lunch because her previous supervisors (Semler and Alesia) both instructed her to be available to them at all times for work purposes. Plaintiff did not clock out for lunch because she made herself available for work, both to her previous supervisors and other employees of defendant. She did not leave the premises to go to lunch. Instead, she worked at her desk or, if she went to the company lunchroom, took her phone with her.

In the first month or two after Vince Alesia took over as Director of the call center, he gave plaintiff a Blackberry phone so he would be able to reach her whenever necessary. Casey Gilliland, a 16-year employee of defendant and a team lead in the call center, testified that plaintiff carried her phone with her even to the bathroom and to

2

the lunchroom, so that she would be available for calls from Alesia. Gilliland was also aware that plaintiff had a company phone at home for the same reason.

Plaintiff frequently received work-related calls during her lunch. Before she started working through lunch, she let those calls go to voicemail. Once she began working through lunch, she took the calls when they came in. Additionally, plaintiff was approached during the lunch period by employees with work-related questions. Plaintiff estimated that her lunch period was interrupted by work of some kind (i.e. calls and/or questions) about 95% of the time. Gilliland, who worked at a desk beside plaintiff, saw plaintiff working at her desk through lunch and also handling employee questions in the lunchroom.

Plaintiff was satisfactorily trained on defendant's employment policies. She understood that she received an unpaid lunch period each day. She understood that it was her responsibility to honestly record her attendance and hours on the company's electronic time-keeping record, and that falsifying time records was grounds for immediate termination.

Plaintiff understood that her direct supervisor and the payroll department each had to check her time records after she turned them in. Defendant's "OCU team" reviews payroll records to determine who is working overtime and contacts supervisors of those employees to ensure that the overtime is approved.

Defendant's company policy is that an employee's supervisor has the ability to approve any employee working through lunch or working overtime. Plaintiff's prior supervisor, Vince Alesia, testified that he unaware of defendant's policy with respect to

clocking in and out for breaks, and he did not know if permission was required for an employee to work through their lunch break. He was unaware of any training or comments to employees in the call center indicating that they were required to take lunch breaks.

Supervisors received "push reports" each pay period which showed if an employee was working overtime. The reports did not show log in and log out detail, such as whether the employee logged in and out for lunch on any given day. The purpose of the reports was to provide supervisors an opportunity to object to any unnecessary overtime and to talk to employees about it. Alesia testified he saw reports showing that plaintiff was working overtime; he took no action on them. Dkt. 71-3 at 15. He does not recall talking to plaintiff about any of the overtime. Alesia testified that when plaintiff was out on FMLA leave in August 2014, no one talked to him about her timekeeping records or whether she was working through lunch.

Additionally at some point while plaintiff worked under Alesia, a one-time report was generated by defendant which tracked overtime hours logged by executive assistants, including plaintiff. The report was done because a budget officer noticed that this group was working overtime, and he wanted to determine if additional resources were needed. Defendant also occasionally produced overtime reports during special incentive periods.

In March 2014, plaintiff was given the "Circle of Excellence Award 2013," which is defendant's "employee of the year" award. Alesia felt that plaintiff had a fantastic worth ethic and was a trusted and responsible individual.

4

No one counseled plaintiff about her overtime or her failure to clock out for lunch until the issue was raised after her return from FMLA leave in August 2014.

Plaintiff was diagnosed with diabetes in October of 1997, the month before she was hired by defendant. To manage the disease, plaintiff takes five shots of insulin daily, monitors her diet, and checks her blood sugar five times each day. In July 2009, plaintiff took approved FMLA leave for gall bladder removal. When she returned from leave she had the same pay, title, and responsibilities as before she took leave.

In June and July 2014, plaintiff was hospitalized for a total of four weeks, during which she underwent approximately six surgeries for a temporary medical condition. From June 16, 2014, to August 13, 2014, plaintiff took approved FMLA leave for hospitalization, treatment, and recovery for the condition. Prior to taking extended medical leave and requesting future intermittent medical leave, plaintiff very rarely used her sick leave. When plaintiff was absent, the call center asked other administrative assistants to cover plaintiff's duties.

In July 2014, Angel Gomez became the new Director of the Wichita Call Center, replacing Vince Alesia. When plaintiff returned to work on August 14, 2014, she began reporting to Gomez. Plaintiff had the same pay, title, and responsibilities as she had before taking FMLA leave. Plaintiff was approved for intermittent FMLA leave on August 14, 2014, to manage her diabetes. Gomez was aware that plaintiff was returning to work on August 14, 2014, after being out on FMLA leave. He was also aware that plaintiff had requested and was granted intermittent FMLA leave on August 14, 2014.

5

On August 20, 2014, after a payroll audit disclosed that plaintiff had not logged out of the time system for lunch for several years, Gomez and Lisa Barnes of Human Resources met with plaintiff to discuss why and who gave her direction to work through her lunch period. During that meeting, no one mentioned misuse of corporate credit cards, the corporate Dillons account, or gift cards.

Gomez and Barnes met with plaintiff again on August 22, 2014, at which time they informed her that she was terminated for recording time over her lunch break. Gomez made the decision to terminate plaintiff's employment. Defendant provided plaintiff with two weeks' pay following her termination, and did not contest her unemployment claim.

In his deposition, Gomez stated that he terminated plaintiff because she came into his office a day or so after the August 20, 2014, meeting and confessed to misuse of the company credit card and company Dillons account. He said she also gave him a bag of mostly inoperable company cell phones that she had failed to turn in to the IT department and some company gift cards she had in her possession. He said plaintiff told him that "I'm coming clean because I want to be given a second chance," and that "I know that I shouldn't have taken these gift cards, I shouldn't have taken these cell phones, I shouldn't have used our Dillon's account for personal reasons." Gomez testified plaintiff told him she had already cleaned out her desk, which Gomez took to mean she felt guilty and knew she had acted inappropriately. Gomez testified that plaintiff asked if she could be demoted so she could remain with the company, but (according to Gomez) he told her that if she went back to an agent role, that would

6

mean handling guest credit cards, and he would not approve of that in light of her admissions.

Plaintiff denies that the foregoing meeting occurred. She denies that she made such a confession, denies that she handed over business cell phones and gift cards to Gomez, and denies that she told Gomez she had cleaned out her desk or that she in fact cleaned out the desk. (Casey Gilliland testified that she cleaned out plaintiff's desk after plaintiff was terminated.) Plaintiff does admit that she previously used the company's Dillons account for some personal purchases (including cigarettes) for which she reimbursed the company, and admits that she told Gomez – at what point the record is not clear – that she had used her company credit card in the past to make some personal purchases for which she had reimbursed the company. Dkt. 72-9, Exh. I.

In his deposition, Gomez stated that the initial payroll audit might have resulted only in a "write up," but "because all these other things were put on my plate by her [referring to plaintiff's alleged confession of misusing company items], that's what led the whole situation to termination, the fact that I just couldn't trust her anymore." Dkt. 71-6 at 7.

Gomez talked to managers Nancy Cziske and Cheri Wright shortly before plaintiff's termination. According to Gomez, he told them plaintiff has confessed to improperly using company credit cards and the Dillons account for personal use, and to having company gift cards. Gomez testified that Cziske told him plaintiff had previously misused the credit card of Mike Semler (plaintiff's former manager) by charging non-business items, and that Semler simply made plaintiff pay the money

7

back. Gomez told Cziske and Wright he was going to terminate plaintiff for the way she had been reporting time on her time card. He told them plaintiff had not tracked her hours appropriately and had not been clocking out for lunch. Gomex testified that he made the decision to terminate plaintiff's employment before he talked to Cziske and Wright.

In her deposition, Nancy Cziske confirmed that she told Gomez plaintiff had improperly charged personal items to a company card at Dillon's while she worked for Mike Semler, and that Semler took the credit card away from her and made her pay the money back. (Cziske said she learned about this from Semler.) Cziske said Gomez spoke to her and Wright to give them a heads-up that he was considering termination of plaintiff for falsifying time records. According to Cziske, however, Gomez did not mention any confession by plaintiff, did not mention anything about misuse of credit cards or gift cards by her, and made no mention of plaintiff keeping old cell phones. Cziske did not recall Gomez saying that he had a conversation with plaintiff.

Cheri Wright similarly stated in an affidavit that Gomez said he was going to terminate plaintiff for the way she had been reporting her time on her time card, but that he "did not tell me that [plaintiff] had confessed to improper use of corporate credit cards, company Dillons account, or gift cards…." Dkt. 71-11. Wright said she had no knowledge of any such improper actions by plaintiff. As a result of this conversation with Gomez, Cheri Wright talked to Casey Gilliland, whom Wright knew often worked through lunch and did not clock out. Wright counseled Gilliland that she should no longer regularly work through lunch.

8

None of defendant's employees reviewed plaintiff's credit card statements or charges, or investigated her use of the company credit card, Dillons account, or gift cards.

After she was terminated, plaintiff talked to Gilliland and told her that she had been terminated for falsifying time records by not clocking out for lunch.

## II. Motion for Summary Judgment.

Defendant argues it is entitled to judgment as a matter of law on plaintiff's ADA and FMLA claims. As to the ADA claim, defendant argues that plaintiff fails to establish a prima facie case of disability discrimination. Even if she overcomes that hurdle, defendant argues that she fails to cite evidence showing defendant's explanation for her termination amounts to a pretext. Dkt. 65 at 13-18. Defendant similarly argues that plaintiff's FMLA claims fail because there is no evidence that defendant's stated reason for plaintiff's termination is pretextual or fabricated, and hence no evidence of any relation between plaintiff's request for FMLA leave and the decision to terminate her. *Id*. at 18-22.

## III. Standards Governing Summary Judgment.

"A party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought." Fed.R.Civ.P. 56(a). Summary judgment is proper if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). A material fact is one that might affect the outcome of the suit under the governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248

(1986). An issue of material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id*.

The movant bears the initial burden of showing the absence of a genuine issue of material fact and entitlement to judgment as a matter of law. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23 (1986)). If it meets this burden, the party resisting summary judgment may not rely upon mere allegations or denials contained in its pleadings or briefs. *Anderson*, 477 U.S. at 256. Rather, it must come forward with specific facts showing the presence of a genuine issue of material fact for trial and significant probative evidence supporting the allegation. *Id.*

Because it is a jury's function to determine the credibility of witnesses and to weigh conflicting evidence, on a summary judgment motion the court must view the evidence and all reasonable inferences in the light most favorable to the nonmoving party. *LifeWise Master Funding v. Telebank,* 374 F.3d 917, 927 (10th Cir. 2004).

**IV. Discussion.**

1. <u>FMLA claims</u>. Plaintiff's first claim is that defendant retaliated against her for exercising FMLA rights. Alternatively, she claims defendant interfered with her right to take FMLA leave. Dkt. 70 at 15.

A claim of retaliation under the FMLA is analyzed under the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Metzler v. Fed. Home Loan Bank of Topeka*, 464 F.3d 1164, 1170 (10th Cir. 2006). Under this framework, it is plaintiff's initial burden to establish a prima facie case of retaliation. If she does so, the burden shifts to defendant to articulate a legitimate, nonretaliatory reason for the

adverse employment action. If defendant makes the required showing, the burden shifts back to plaintiff to show a genuine dispute about whether the proffered explanation was a pretext. *Metzler*, 464 F.3d at 1170. The plaintiff may establish pretext by showing "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its actions that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory [or non-retaliatory] reasons." *Bennett v. Windstream Commc'ns., Inc.*, 792 F.3d 1261, 1267 (10th Cir. 2015) (citation omitted).

Defendant concedes that plaintiff has established a prima facie case of retaliation. Dkt. 65 at 20. It argues, however, that defendant "terminated her employment because her supervisor could no longer trust her," *Id.* at 16, and that plaintiff fails to cite any evidence showing this explanation is a pretext. Viewed in the light most favorable to plaintiff, however, the court concludes that plaintiff has cited sufficient evidence from which a reasonable jury could find that this explanation is not worthy of credence.

Angel Gomez made the decision to terminate plaintiff, and his testimony was clear that he did so because of plaintiff's alleged confessions of wrongdoing to him in a meeting on or about August 21, 2014.[2] Plaintiff allegedly confessed a multitude of sins during that meeting, including the misuse of the company credit card, misuse of the company Dillons account, improperly taking company cell phones, and improperly

---

[2] Defendant asserts that plaintiff was terminated "because her supervisor could no longer trust her," but Gomez's explanation makes clear that plaintiff's alleged "confession" to him was the basis of that asserted lack of trust.

11

taking company gift cards. She allegedly acknowledged her wrongdoing and asked to be kept on in a demoted position, while telling Gomez that she had already cleared out her desk. The problem, however, is that a reasonable jury could conclude from the evidence that none of this actually happened.

Plaintiff denied under oath that she had any such meeting with Gomez or that she made any such admissions to him. Moreover, Gomez claims that he told two other managers of plaintiff's admissions to him prior to her termination, but they both testified that Gomez made no such statements. Clearly, a jury weighing this conflicting testimony might conclude that Gomez is not telling the truth. Of course, it might also find that a simple failure of recollection explains this discrepancy. But on this record, a jury could reject Gomez's explanation of the termination as being inconsistent with or contradicted by substantial evidence. A jury viewing the evidence in plaintiff's favor might find that Gomez's explanation is "unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons." *Cf. Bennett*, 792 F.3d at 1267. A jury inclined to believe plaintiff's evidence might draw an additional inference of pretext from what it could view as an abrupt termination of plaintiff's employment, after seventeen years of satisfactory service (and about the same time she was named "employee of the year"), all within a week of her having requested FMLA leave, and without any adequate inquiry by the employer into the circumstances that allegedly justified the termination. In that vein, a reasonable jury might also infer that plaintiff's prior supervisors either actively encouraged her to work through her lunch period or knowingly permitted it, and that they gave tacit – if not explicit - approval for

12

her to accumulate overtime this way. A jury might further conclude that other supervisors did the same with respect to other employees, but that the others were not scrutinized or treated the same as plaintiff.

In sum, this and other evidence creates a genuine issue of material fact as to whether defendant's asserted reason for plaintiff's termination is unworthy of credence, as well as whether defendant unlawfully retaliated against plaintiff for exercising her FMLA rights or unlawfully interfered with plaintiff's FMLA rights.[3] *See Reeves v. Sanderson Plumb. Prods., Inc.*, 530 U.S. 133, 147 (2000) (a plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated).

2. <u>ADA Claim.</u> Plaintiff alleges that defendant discriminated against her in violation of the ADA because it terminated her employment based on a perceived impairment from her diabetes, notwithstanding that she was qualified to perform the job.

The ADA prohibits discrimination "against a qualified individual on the basis of disability." 42 U.S.C. § 12112(a). To establish a prima facie case of discrimination, a plaintiff must show that (1) she is disabled as defined under the ADA; (2) she is qualified, with or without reasonable accommodation by the employer, to perform the essential functions of the job; and (3) she was discriminated against because of her

---

[3] Because defendant relies on the same argument with respect to plaintiff's FMLA retaliation and interference claims, the evidence of pretext noted above warrants a denial of summary judgment as to both claims. *See* Dkt. 65 at 20 (arguing that "Plaintiff has no evidence that Royal Caribbean fabricated the reason for her termination in order to justify an attempt to interfere with her FMLA leave.").

disability. *Adair v. City of Muskogee*, ___F.3d___, 2016 WL 3034084, at *5 (10th Cir. May 26, 2016).

Defendant argues plaintiff cannot satisfy the first element because there is no evidence that defendant mistakenly believed her to be disabled. Dkt. 65 at 14. In so arguing, defendant cites the standard for "regarded as" claims prior to the 2008 ADA amendments. See Dkt. 65 at 14. But under the applicable version of the ADA, a plaintiff shows that the employer regarded her as having an impairment if: (1) she has an actual or perceived impairment, (2) that impairment is neither transitory nor minor, and (3) the employer was aware of and therefore perceived the impairment at the time of the alleged discriminatory action. *Adair*, 2016 WL 3034084, at *6. Plaintiff has cited evidence to meet all of the foregoing elements. She has an actual or perceived impairment from diabetes which is neither transitory or minor, and defendant was aware of the impairment at the time it terminated plaintiff.

Defendant also argues that plaintiff fails to cite any evidence to satisfy the third element of a prima facie case – i.e., that she was discriminated against because of her disability. But given that plaintiff was terminated barely one week after requesting an accommodation related to her diabetes, and was dismissed after seventeen years of service under the circumstances described above, plaintiff has cited sufficient facts to give rise to an inference of causation. *See Tadlock v. Marshall County HMA, LLC,* 603 Fed.App'x 693, 703, (10th Cir., Feb. 25, 2015) (temporal proximity satisfied third element of prima facie case); *Janczak v. Tulsa Winch Co.*, 621 Fed. App'x 528, 534 (10th Cir. July 30, 2015) (the temporary proximity between plaintiff's leave and his firing, combined

with other evidence, establishes a prima facie case); *Metzler v. Fed. Home Loan Bank of Topeka*, 464 F.3d 1164, 1171 (10th Cir. 2006) (plaintiff may rely on temporal proximity alone if the termination is very closely connected in time to protected activity); *Bowers v. Bethany Med. Center*, 959 F.Supp. 1385, 1392 (D. Kan. 1997) (discharge within three weeks of return from disability leave sufficient to satisfy causal element of prima facie case).

Lastly, defendant argues there is no evidence that its proffered reason for terminating plaintiff – i.e., her supervisor's lack of trust in her – is a pretext for discrimination. But for the same reasons previously discussed, a reasonable jury could conclude that her supervisor's stated reason is unworthy of credence, and hence infer that defendant acted for a discriminatory reason.

**IT IS THEREFORE ORDERED** this 22nd day of June, 2016, that defendant's Motion for Summary Judgment (Dkt. 64) is DENIED.

\_\_\_\_s/ J. Thomas Marten\_\_\_\_\_
J. THOMAS MARTEN, JUDGE